John Owen v. Mary A. Campbell et al.

*Trusts—Sale of stock by trustee—Liability.*

This case involves the question of the alleged sale by a trustee of stock in a dry-dock company, held by him in trust for certain heirs, for less than its value, thereby benefiting the trustee by a large increase in his salary as an officer of the company, and enabling him to make a large profit upon his own stock, and that subsequently purchased of another stockholder. And the finding of the circuit judge that after a most careful review of the entire testimony in the case, under the facts as they are made to appear, the trustee could not be held chargeable with misconduct in the discharge of his office or the management of the trust property, is concurred in by the Court.

Appeal from Wayne. (Gartner, J.) Argued February 13, 1894. Decided April 10, 1894.

Petition by Alexander McVittie for his discharge as trustee for defendants under the will of Gordon Campbell, deceased, and for the settlement of his accounts. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*William H. Wells* (*George W. Radford,* of counsel), for petitioner.

*Edwin F. Conely* and *Orla B. Taylor* (*F. A. Baker,* of counsel), for defendants.

Hooker, J. One Gordon Campbell died leaving a will, by the terms of which John Owen was appointed trustee to manage the property of the estate until testator's youngest child should reach the age of 21 years. Subsequently, Owen filed a bill in chancery, tendering his resignation, and asking that he be discharged. Such order was made,

and Alexander McVittie and William J. Gray were appointed trustees in his place. At this time most of testator's children had attained their majority. The youngest did so on May 11, 1891. The estate was large, amounting to $200,000 or more, and a part of it consisted of 2,400 shares of the stock of the Detroit Dry-Dock Company, a concern in which both Owen and McVittie held stock; the latter being the manager, and the former a director. On January 21, 1887, McVittie and Gray, with the consent of some of the Campbell heirs, sold the 2,400 shares of stock to James McMillan; and on May 11, 1891, the estate was distributed by Gray (McVittie being in California), who took a receipt from the Campbell heirs embodying an inventory of the property on hand, and the following:

"We hereby acknowledge the receipt from Alexander McVittie and William J. Gray, trustees of the estate of Gordon Campbell, deceased, the securities above described; the trust having terminated upon the majority this day of the youngest child of Gordon Campbell, and the children procuring a release of the trustees by Mary Campbell and Ann Campbell.

"Detroit, May 11, 1891."

On June 16, 1891, McVittie filed a petition in the circuit court, in chancery, praying for his discharge. An answer was filed by the Campbells opposing such discharge, alleging fraud by McVittie in the sale of the dry-dock stock, and asking a decree against him for a large sum on account thereof.

The testimony taken shows that the concern had been in existence for quite a long period, and had, in the main, been successful; large dividends having been declared some years, while others had passed without any. It had not escaped embarrassment, however; a strike having been inaugurated early in 1886, which was not satisfactorily adjusted until late in the year, and brisk competition having arisen in the building of vessels. As late as October,

1886, some stock changed hands at par, and one stock-holder asked McVittie to find him a purchaser for his stock at $30 a share. Another offered him a commission of $1 a share if he would sell his stock at $28 per share. Frank E. Kirby, the master mechanic, who had long been with the company, was anxious to get out of the concern, and there were indications of unrest and dissatisfaction on the part of others. Again, there was a suspicion that one Darling, who was the largest stockholder, might desire to obtain a controlling interest; and the feeling was shared by most of the members that this would be disastrous, and would depreciate the stock. A proposition was dis-cussed, looking to the sale of a majority of the stock to James McMillan, and a number of the stockholders con-sented to let their stock go to him at that price, viz., $30 per share. They were as follows: Owen, 2,704 shares; Peck, 1,100 shares; McVittie, 800 shares; Frank E. Kirby, 1,068 shares; Campbell heirs, 2,400 shares; total, 8,072. The offer was made to Mr. McMillan, who, after the lapse of some weeks, declined it, but subsequently accepted the offer as to the Campbell stock; and it was assigned to him, and paid for. Before he would purchase this, he required an agreement from Kirby and McVittie that they would remain with the company. Subsequently, at his suggestion, McVittie bought the 1,100 shares belonging to Peck at $30 per share, the money to pay for the same being loaned him by the company. An agreement was then made by McMillan, Owen, McVittie, and Kirby, with a view to preventing the concern from getting into unfriendly hands, and business was successfully prosecuted. Large orders for vessels were given to the company by concerns with which Mr. McMillan was connected, through his influence, and the business proved very profitable. Two or three years later the stock was contracted to an English syndicate at $60 a share, but they failed to take

it; and it was then sold at that price to the present owners, of whom Mr. McMillan is one. This was in March, 1890. McVittie's salary was increased from $5,000 to $10,000 per year soon after the sale of the Campbell stock.

From these circumstances the defendants argue that they were made the victims of a scheme by Mr. McVittie to sell their stock for less than its value, thereby benefiting himself (1) by a large increase in salary; (2) by enabling him to make a large profit upon his stock, and that subsequently purchased of Peck. It is argued that McVittie worked upon the fears of the Campbell heirs and others by portraying the dangerous consequences of control by Darling, when at that time he had the option of purchasing the 1,100 shares belonging to Peck, by the purchase of which he could have prevented Darling's control; that he asked secrecy, and required a hasty decision by defendants; that he pretended that he and several others were going to sell to McMillan, when such was not the intention; and that he did not inform the defendants or his cotrustee, Gray, of the fact that McMillan had concluded not to purchase his and other stock, but allowed them to sell the estate's stock in ignorance of that fact; and, further, that he represented the price obtained to be a good one, when, as a fact, it was then worth, and could have been sold for, much more, viz., $37.50 per share.

From the testimony, we reach the conclusion that the desire of Peck and Kirby to sell their stock was *bona fide*, and that McVittie may well have been disturbed at the thought of such sale, and the withdrawal of Kirby from active participation in the management of the affairs of the company. At the same time, Owen was willing to sell for $30; and it is a significant fact that no one cared to buy, unless, perchance, it was Darling, who was a speculator, and whom no other stockholder wanted to see in

control. There was an ominous unanimity on the part of the stockholders upon this subject. Again, McVittie did not avail himself of the opportunity to make $3,300 by a purchase of Peck's 1,100 shares at $27 per share, which profit, according to the claim of defendants' counsel that the stock was worth $37.50, would have amounted to $11,550. This was not stock which was quoted upon the market, with a value. Such sales as had been made were at par. It was offered in large blocks at $28 and $30; and that, too, by the men longest connected with, and most essential to the welfare of, the company. In short, those having the best opportunity to judge were concerned about it to an extent that made them desire to get out of the company. McVittie's concern was a double one: First, he had his personal interest to care for; second, he was trustee with another for an estate holding three times as much stock as he possessed, and it was his duty to be diligent in caring for such interest. On the one hand, he had no right to use corruptly the property of the estate for the advancement of his own interests, or use it for speculative purposes. On the other hand, he would not be excused if he neglected to manage prudently the property of his *cestuis que trustent*. Had McVittie looked after his own interest, by merely selling his own stock, leaving the estate stock to suffer from the abandonment of the concern by Kirby and himself, these defendants would have complained; and had Mc-Vittie and others sold a majority of the stock to McMillan or a syndicate, without trying also to sell that of the estate, defendants would probably have been dissatisfied, if loss resulted to them. As it is, they waited these many years, until success has attended the enterprise, and now ask the profits, without having carried any of the risks. McVittie had a right to look after his own interests, first by offering his stock to McMillan, so long as it was done

in good faith. He had a right to do the next best thing when he could not sell it, viz., to remain with the concern, and aid in building it up. We think that the claim of fraud is not proved, and that, as matters then stood, it was prudent management to sell the Campbell stock, notwithstanding the fact that the business had latent possibilities under, another control. But for this change, which appears to have been the only one possible, there is no reason to think that the stock would have increased in value; and we think the evidence clearly establishes the fact that $30 was its reasonable market value at the time. We are satisfied that the fears of Darling were general and spontaneous, and honestly held by McVittie, as well as by the Campbells and Gray, who were asked to, and did, investigate the question of the condition and value of the stock, and the wisdom of the proposed transfer to McMillan. There was nothing in the request for an early decision. McVittie wanted to make an offer, and may have thought delay likely to endanger the project. The matter hung fire for several weeks before acceptance, and the offer could have been withdrawn, had either Gray or the Campbells changed their minds about it. The injunction of secrecy as to the proposed deal may have been a wise one, and it should not be construed to mean that the parties should not inform themselves regarding the advisability of selling their stock at $30. We have no doubt of the good faith of the statement by McVittie that he expected to sell his stock to McMillan, and the evidence shows no effort at concealment when the proposition was changed. We therefore concur in the view expressed by the circuit judge in his finding filed in the case, that "after a most careful review of the entire testimony in the case, under the facts as they are made to appear, and which are, as a matter of fact, not disputed, Mr.

McVittie could not be held chargeable with misconduct in the discharge of his office, or the management of the trust property."

The decree below will be affirmed, with costs.

The other Justices concurred.